## CHENALL v. PALMER BRICK COMPANY.

It appearing from the plaintiff's evidence that the injury sustained by him was caused, not by any negligent act or omission of duty on the part of his master, but by the fault of a fellow-servant, a nonsuit was properly granted.

Submitted March 3,—Decided May 24, 1906.

Action for damages.    Before Judge Reid.    City court of Atlanta.    April 19, 1905.

This case has heretofore been twice before this court.    See 117 Ga. 106, 119 Ga. 837.    On its last appearance here, the fact was pointed out that while the plaintiff alleged that the crown of the brick kiln which fell and injured him was constructed in a careless and unworkmanlike manner, and in general terms charged the defendant company with having been guilty of negligence, yet the only specific act of negligence set forth in the plaintiff's petition was that the supports upon which the top or arch of the kiln had been built were removed too soon, and, as a result of this removal, the arch fell.    119 Ga. 845-846.    Subsequently the plaintiff amended his petition by alleging, that the brick kiln was negligently constructed, in that the "buck-stay" rods were too low and touched the top of the arch; that they pressed down upon the top of the arch and had to be "slacked off" and prized up in order to admit of the brick being placed upon the "center," or wooden frame, and under these rods; that in consequence they did not bind together the walls of the kiln and strengthen the arch, as was their proper office, but weakened the arch and contributed to its downfall; and that the defendant had knowledge of these facts, or by the use of ordinary diligence could have had knowledge of them, whereas the plaintiff was in ignorance of these facts and had no way of ascertaining them.    The plaintiff further amended by alleging, that the arch which fell and injured him was intended to span and did span a distance of about fifteen feet, and consisted of many tons of brick and mortar; that the construction of this arch was a work requiring great care and skill, and also a knowledge of the correct principles of arch construction, on the part of the person or persons planning and constructing it, of all of which the defendant had or should have had full knowledge; but although well aware of the skill and care and knowledge required to safely construct the arch, defendant intrusted the whole planning and over-

sight of the construction thereof to its superintendent, J. D. Sloan, and its foreman, Charles Montgomery, who had no skill or knowledge in and about the construction of such arches, and who were incompetent to oversee such construction and insure the safety of the work; of which facts the plaintiff was ignorant, though they were well known to the defendant; and that to so intrust the construction of the kiln and arch, in and under which the defendant well knew many men would be constantly employed, was gross negligence, and indicated an utter carelessness on the part of the defendant as to the safety of its employees. The last trial of the case resulted in a judgment of nonsuit, and the question now presented for decision is whether or not the plaintiff sustained by proof any of the specific allegations of negligence made in his pleadings as amended.

*Burton Smith, J. W. Moore,* and *George Gordon,* for plaintiff. *Smith, Hammond & Smith,* for defendant.

EVANS, J. (After stating the facts.) No evidence was offered in behalf of the plaintiff which tended to establish his contention that the defendant's superintendent, Sloan, "had no skill or knowledge in and about the construction of such arches" as that which fell, or that the master knew that he was incompetent to act in the capacity of its superintendent, or that "the construction of this arch was a work requiring great care and skill, and also a knowledge of the correct principles of arch construction, on the part of the person or persons planning and constructing said arch." It is doubtless true that much care and skill are necessary in the performance of such work, but it is equally certain that the plaintiff did not prove that the plan adopted for rebuilding the arch which had previously fallen was unusual or improper or open to any criticism, or that the defendant company, in intrusting "the whole planning and oversight of the construction thereof to its superintendent, J. D. Sloan, and its foreman, Charles Montgomery," well knowing that many men would be constantly employed in the kiln and under the arch, was grossly negligent, and indicated an utter disregard for the safety of its employees. Accordingly, the plaintiff was not entitled to recover under that amendment to his petition in which he alleged that his master was negligent in retaining in its service a superintendent and foreman who were known to be incompetent to perform the duties assigned to them.

Nor did the plaintiff make out his case upon the theory of negligence and resultant liability, specifically set forth in his original petition, viz., that the supports upon which the top or arch of the kiln had been built were removed too soon, and, as a result of such premature removal, the arch fell. On the contrary, he introduced testimony which disclosed that the real cause of the falling of the arch was that assigned in the amendment to his petition, in which he alleged that the "buck-stay" rods were "slacked off" and prized up in order to admit of the brick being placed upon the "center," or temporary wooden framework over which the arch was constructed, so that they did not sufficiently bind together the walls of the kiln and strengthen the arch, as was their proper office, but weakened the arch by pressing down upon it, and contributed to and brought about its downfall. Only one witness, a bricklayer, who had assisted in building the arch, was examined upon this point. He testified, in substance, as follows: After the arch fell, he observed that the walls of the kiln were badly cracked, and in his opinion the giving way of the walls caused the arch to fall. When he first went to work, the "buck-stays" had been put up and tightened up. After the building of the arch had progressed somewhat, the fact became apparent that the "buck-stays" had not been placed high enough above the arch, but rested on top of the brickwork, so that they had to be loosened up in order to get the brick down. . The "buck-stays" were tightened up afterwards. In tightening them, the rods were drawn down so that they prized too much on the arch. Charles Montgomery, the "boss" or foreman, "looked after that," and the company's superintendent, Mr. Sloan, did not, the witness thought, have "anything to do with that at all." The "buck-stays" were there all the time; some new ones had been put in; those there before were all right, were good. The posts and "buck-stays" were up there to stay, and the falling in of the kiln did not affect them in any way; they were put up just before the workmen started to put the arch on, and "had nothing to do with the laying of the brick at all." Mr. Sloan came around occasionally, but Charlie Montgomery looked after the laborers and kept them going. "The proper thing to do with these buck-stays before you begin to lay the brick is to put them where you want them to stay, and don't move them any more. These were moved; were tightened up and slacked off. Neither I nor

Chenall had anything to do with that or with putting them back. Charley attended to putting them up and seeing that the rods were raised." "I guess you would call it dangerous" after the rods were again tightened, "because the buck-stays were pulled down. So far as I saw, there was no danger of the arch falling; . .. I did not think it was going to fall; it then looked all right to me. So far as I knew, it seemed to me to be all right." Charley Montgomery helped the brick-masons in carrying on the work. He rolled some brick and sometimes pitched them up, just like the other laborers do there. "If it was necessary, he would take the wrench and tighten up the rods; he put in all of the new posts that were put in at all, he and the other laborers; he did not do it by himself. He also put in the rods the same way. When I went there the rods were all in. Put the posts up and put the rods in them all in shape, and we put the arch right underneath these rods. Mr. Sloan wasn't around there very often." Witness never saw a kiln that did not fall after it had been in use in burning brick for two years; sometimes they go in a year, sometimes after one or two burns they fall. He did not remember how long this one had gone before falling.

Upon this evidence the plaintiff must rest his alleged right of recovery. The question which it presents for determination is whether the defendant company is chargeable with the negligence of its foreman, Charley Montgomery, in placing the "buck-stays" too low, and subsequently undertaking to facilitate the work by loosening them in order that the brickwork of the arch might be completed, and then, after the resisting powers of the side walls of the kiln had been weakened, tightening the rods till they rested upon and pressed down on the top of the arch. That the company, through its superintendent or otherwise, had any notice of the improper manner in which the work was being conducted by Montgomery, its foreman, was not shown; nor did the plaintiff essay to allege or prove that the original plan upon which the kiln was constructed was not such as to admit of the rods being placed at a sufficient height to allow ample room for the building of an arch beneath them without their being loosened after being once drawn taut and the brickwork of the arch had been begun. Had the plaintiff sustained by evidence his contention that the defendant company had knowledge or was chargeable with knowledge of the

fact that notwithstanding the "buck-stays" were placed too low, its foreman was carrying forward the building of the arch in the improper manner above stated, the case presented would be altogether different. As it is, we are only called on to decide whether the plaintiff's injury was attributable to any affirmative act of negligence or omission of duty on the part of the master of which complaint is made in the plaintiff's petition as amended, or was due solely to the negligence of a fellow-servant. The testimony of the plaintiff himself, as well as that of every other witness who testified concerning the matter, discloses that Charley Montgomery was merely a colaborer, employed to assist the brick-masons by supplying them with brick and mortar, and to work with the plaintiff and other unskilled workmen and see that they kept busy. He was, in common parlance, their "boss," and had previously assisted them and directed the carrying out of orders to place some new posts in the kiln and put in and tighten up the "buck-stays," preparatory to the advent of the brick-masons. When the "buck-stays" were found to be too low to admit of the placing of the brickwork of the arch beneath them, he assumed to remove the difficulty by loosening the rods and pressing them upwards. It does not appear that he was acting within the scope of his duty in thus assuming charge of the embarrassing situation, instead of reporting the encountered difficulty to the company's superintendent, who had engaged the masons to do the brickwork and had general supervision over them and the other workmen whilst engaged in putting a new crown upon the kiln, but was not present to superintend the work at all times. Looking to the evidence bearing on the subject of the relation which Montgomery sustained towards the plaintiff, the conclusion is irresistible that they were fellow-servants, even though the former may have had authority to direct the latter and the other workmen how the tasks assigned to them should be performed. "A workman engaged in the same job with others and having direction of it is not a vice-principal of the master, but stands on the footing of a mere fellow-servant." *Shepherd* v. *Southern Pine Co.*, 118 *Ga.* 292. Unless the master knew of and approved the plan devised by Montgomery of loosening the "buck-stays" so that they would not interfere with the work of the brick-masons, the defendant company can not be held accountable for the error of judgment committed by him. *River-*

*side Mills* v. *Jones,* 121 *Ga.* 33, 38. "A fellow-servant without the master's knowledge can not, by an assumption of authority, convert himself into a vice-principal or alter ego of the master." *Hilton Lumber Co.* v. *Ingram,* 119 *Ga.* 652 (8). So, in the absence of proof that the defendant company had delegated to Montgomery authority to direct how the arch should be constructed or to supervise its erection, it can not be assumed that he was its vice-principal in causing the arch to be improperly and insecurely built. For what he did while acting in the capacity of a fellow-servant of the plaintiff, the master can not be held liable, and it was incumbent on the plaintiff to show what was the real truth in this regard.

The plaintiff's case could not properly have been saved from the fate of a nonsuit by an application of the maxim res ipsa loquitur. It appearing not only what was the direct and proximate cause of the falling of the arch, but also that its improper construction was due to the fault of a fellow-servant, and not to any act of negligence with which the master was charged, that maxim could not have been invoked before a jury. This much was settled when the case was last here (119 *Ga.* 841-844, 846-847), and the ruling then announced is to be regarded as conclusive upon this point.

*Judgment affirmed. All the Justices concur.*